Filed 8/22/24 In re A.G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| MENDOCINO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br> v. <br> A.G., <br><br> Defendant and Appellant. | A169551 <br><br> (Mendocino County <br> Super. Ct. No. 22JV00017-01) |

A.G. (father) appeals from the juvenile court's order terminating his parental rights over his now six-year-old daughter A.G. (minor) pursuant to Welfare and Institution Code[1] section 366.26. Father contends the court erred in declining to apply the beneficial relationship exception to adoption. (§ 366.26, subd. (c)(1)(B)(i).) We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

1

*Proceedings Before Section 366.26 Hearing*

These proceedings were initiated pursuant to a section 300 petition alleging failure to protect and abuse of a sibling.

In its detention report, the Mendocino County Department of Social Services (Department) noted it had received a referral alleging then three-year-old minor, who was living with mother,[2] was present "in the home where dangerous items were found within reach." Specifically, the social worker observed drug paraphernalia, including syringes, which were " 'loaded and ready to go with heroin' " on the bed, dresser, and in a tote bag on the floor; a "blackened spoon with an unknown substance" and what appeared to be marijuana; and a "rubber tourniquet laying on the floor," all of which "was at child level, and in easy reach of both children."[3]

In the Department's interview with father, he stated he had lived with mother prior to minor's birth for three years. He maintained he had never observed mother to be under the influence, although "he had heard rumors she was using." From birth, minor mostly lived with mother, while father lived about two minutes away. Except for a three-month period when minor lived with paternal grandmother and father, father never lived with or had custody of minor. Despite testing positive for methamphetamine and marijuana, father denied any drug use stating, he had not used methamphetamine since he was 18.

---

[2] Mother is not a party to this appeal, and we relate only those facts relevant to the issues on appeal.

[3] Minor's half sibling, five-year-old H.S., also resided in the home. He is not a party to this appeal.

The court ordered minor, along with her half sibling, placed in maternal aunt's home and set the matter for a jurisdiction and disposition hearing.

At the conclusion of the hearing, the court found the amended counts of the petition true,[4] adjudged minor a dependent of the court, found by clear and convincing evidence removal was necessary, ordered reunification services and supervised visitation for father, and set the matter for a review hearing.

Over the next year and a half, the Department recommended continuing services. During that time, father had been doing well and minor had started overnight visits. However, after three overnights visits, visits were suspended because father relapsed. At the 18-month review hearing, the Department recommended services be terminated.

At the conclusion of the hearing, the court terminated services to father and set the matter for a section 366.26 hearing.

*Section 366.26 Hearing*

In its section 366.26 report, the Department recommended termination of parental rights and making adoption the permanent plan.

The report noted that during the prior 18 months, father visited minor "three times per week by Zoom and once a week in-person." Visitation had progressed to "overnight visits" during the last review period. However, there were "concerns" as minor had recently regressed in bed wetting and having nightmares after overnight visitation began. Visits were then "pulled back to [be] supervised again" due to father's relapse. After services were

_____

[4] The factual bases for the amended counts related to father's past and current drug use; his "extensive Child Welfare history including one or more of his older children who he does not have in his custody"; and father's failure to protect minor despite knowledge of mother's continuing drug use.

3

terminated, father missed seven in-person visits but continued to make Zoom visits. When minor did "not show interest in Zoom visits, [father] agree[d] to end them early instead of stretching them out," and as a result, Zoom visits had "become increasingly shorter." Since the beginning of the proceedings, minor had been placed with maternal aunt with whom she "had an existing relationship" and with whose home she was familiar. Maternal aunt and her husband had provided a "comfortable, safe, and nutur[ing]" home for minor and "demonstrated their commitment to [minor's] well-being and now permanency." Minor had "thrived" in her placement and appeared "to feel comfortable, safe, and nurtured."

The Department also filed an Adoption Assessment Report. The adoption specialist confirmed father had attended "at least 134 visits" with minor since detention, including 114 Zoom visits, 16 in-person visits, 3 overnight visits, and 1 phone visit. At the beginning, father was "diligent and creative in his effort to engage" minor during Zoom visits. However, after six months, minor "became less engaged and responsive." It was unknown if the decreased engagement was due to "changes in her relationship" with father, minor's "successful acclimation" to maternal aunt's home, " 'Zoom fatigue,' " or something else. Regardless, toward the end of the reunification period, minor would begin the call by stating, " 'I don't want to talk today.' " During in-person visits, father "generally behaved appropriately," and minor "was reported to be happy to see her father at the visits and often ran to greet him with a hug." After her first overnight visit, minor began "wetting and soiling herself several times per day, after months of having no toileting accidents." Shortly thereafter, the overnight visits were suspended.

4

The specialist opined a "continuing relationship between [minor] and her birth parents would be beneficial for [minor] particularly if the birth parents addressed the issues that led [minor] to come into care." Father had been "mostly consistent in his visitation," and minor and father's interactions "appear to be mostly positive and enjoyable for [minor]."

Finally, the specialist stated terminating parental rights would not be detrimental to minor's well-being. Despite any positive relationship minor has with parents, "the permanency, safety, and security that [minor] would gain through adoption outweigh the potential detriment from terminating parental rights." Minor had been in her current placement almost two years. She appeared "to have substantial emotional ties to the potential adoptive parents" and "removal from [them] would be detrimental to [her] well-being."

At the section 366.26 hearing, father did not testify—although he was present—and his counsel read a letter from father instead. The letter expressed father's "deep concern about the termination of [his] parental rights." Additionally, father expressed his feelings over the separation from minor, his " 'earnest efforts ' " in complying with his case despite " 'a lack of support' " from the Department, and his willingness to go to " 'rehab [if] necessary,' " because minor's " "best interests are served by going with her father.' " He described the " 'false allegations' " from mother and detailed the services he completed, despite the " 'challenges and delays that have been orchestrated by CPS,' " and asked the court to " 'consider these efforts, and grant [him] another chance and opportunity to prove [his] devotion and how [he has] changed.' " He closed by asking the court to " '[p]lease allow [minor] to be in . . . [his] care' " and for him " 'to reengage' " with services.

Minor's counsel objected to the letter on relevance grounds stating, "This is a two-six, and that is not even an option for Your Honor to grant

5

additional services." Counsel for the Department joined the objection stating, "the only thing relevant at today's hearing is whether there is clear convincing evidence of adoptability, and whether or not any of the exceptions to termination of parental rights have been proven by a preponderance of evidence by the parents. And so that does not apply today. [¶] So I would say in reply to that letter that those statements would not provide the Court grounds with which to provide services to the father, or to do anything other than address the issues at the two-six hearing of the clear and convincing evidence of adoptability."

The court overruled the objections and accepted father's statement, although observing, "it is largely irrelevant to the issues before the Court today. Services have been terminated." Father's counsel made no objection.

Minor's counsel then moved on to the issue of termination stating, minor was "doing really well" and "thriving" in her current placement, where she had been "since the inception of this case" with her half sibling. Counsel asserted minor "is adoptable, so . . . that prong has been met. And at this time, I don't believe any exceptions apply. [¶] The parental bond exception does not apply in this case. There's been no such evidence demonstrated or provided by father's counsel, and I would ask Your Honor to grant the two-six today." Counsel for father and the Department submitted without comment.

The court commenced its ruling by disagreeing with father's assertion in his letter that the Department had not been helpful. In any event, the court stated, "the clock has run out. Services have been terminated," and the focus is now on minor and "what is best for her." Minor had been in her placement "for two years now," and the court wanted "security for her." The court found by clear and convincing evidence minor is likely to be adopted, identified adoption as the permanent plan, and terminated father's and

6

mother's parental rights. The court noted termination of parental rights would not be detrimental, and "[d]espite having positive relationships at some points with both parents, permanency, safety and surety that she would gain via adoption outweighs any potential detriment from terminating parental rights."

## DISCUSSION

*Beneficial Relationship Exception*

"At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) Instead, the purpose of the hearing is to select and implement a permanent plan. (*Ibid.*) "[T]he court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if a parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).)" (*Caden,* at pp. 630–631.) One of those reasons is the beneficial relationship exception. (*Id.* at p. 631.)

The Department first contends father forfeited the issue of applicability of the beneficial relationship exception by failing to raise it below. We agree.

"If a parent fails to raise one of the exceptions at the [section 366.26] hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial

7

court's determination is supported by substantial evidence. [Citation.] Allowing the [parent] to raise the exception for the first time on appeal would be inconsistent with this court's role of reviewing orders terminating parental rights for the sufficiency of the evidence." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 403.) Thus, a failure to raise an exception forfeits the issue on appeal. (*Ibid.* [forfeiture of sibling relationship exception]; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252 [forfeiture of beneficial relationship exception]; see also *In re Daisy D.* (2006) 144 Cal.App.4th 287, 292 (*Daisy D.*) [no sua sponte duty to consider exception to adoption, and parent's failure to raise it in juvenile court precludes her from doing so on appeal from termination of rights].)

Father asserts he was impliedly "imploring the juvenile court to apply the parental-benefit exception on behalf of his daughter and order a permanent plan of legal guardianship" through his letter to the court.

We disagree. Nothing in the letter alerted the court that father was raising the exception, nor did father produce any evidence to support it. Instead, his letter focused primarily on reinstating reunification services. It is clear from the record, the court and counsel for the Department and minor all interpreted the letter as a request to reinstate services. Neither father nor his counsel made any suggestion the letter was more expansive than that. Nor did they say anything in response to the Department's objection to the letter, in which county counsel asserted the section 366.26 hearing was a time to decide if minor was adoptable and whether any exceptions applied, and that none applied in this case. They similarly did not object when minor's counsel later stated, "The parental bond exception does not apply in this case. There's been no such evidence demonstrated or provided by father's counsel, and I would ask Your Honor to grant the two-six today."

8

Having failed to raise any statutory exception to termination of parental rights at the section 366.26 hearing, father has forfeited the issue. (*Daisy D., supra*, 144 Cal.App.4th at p. 292.)

Even assuming father had preserved the issue for review, the court did not err in terminating parental rights.

The beneficial relationship exception applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent must prove, by a preponderance of evidence, three things: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.) We review the first two elements for substantial evidence, and the third for abuse of discretion. (*Id.* at pp. 639–640.)

Here, assuming without deciding that father met the first element of the exception, regular contact, we address only the second and third elements, beneficial relationship and detriment.

The second element requires the court to determine "whether the child would benefit from continuing the relationship with her parent. . . . '[T]he relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or, 'negative' effect of the interaction between parent and child, and the child's particular needs." [Citation.]' (*Caden C., supra*, 11 Cal.5th at p. 632.) '[C]ourts often consider how children feel about, interact with, look to, or talk about their parents.' (*Ibid.*) *Caden C.* instructs us that 'it is not necessary— even if it were possible—to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent]

9

provided during [his or] her weekly visits." [Citation.]' (*Ibid.*) Expert opinions or bonding studies provided by psychologists who have observed and/or reviewed the parent-child relationship are often 'an important source of information about the psychological importance of the relationship for the child.' (*Id.* at pp. 632–633, fn. omitted.) Ultimately, the court's role is to decide whether the child has a ' "significant, positive, emotional relationship with [the parent]." ' (*Id.* at p. 633.)" (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316–317 (*Katherine J.*).)

The third element asks the court "to ascertain whether severing parental ties—and thus 'terminating [the] parental' relationship—would be detrimental to the child. (*Caden C., supra*, 11 Cal.5th at p. 633.) 'What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' (*Ibid.*) Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act. The 'subtle, case-specific inquiry [that] the statute asks the courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" ' (*Ibid.*) 'When the relationship with the parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child due to" the child's beneficial relationship with a parent.' (*Id.* at pp. 633–634.)" (*Katherine J., supra*, 75 Cal.App.5th at p. 317, fn. & italics omitted.)

As to the second element, father points out his "meaningful visits with minor," in which the two "played, conversed, and exchanged hugs and kisses";

10

that minor often ran to greet him; and the Department's observation that a continuing relationship would be beneficial for minor.

Although it is clear, as the court noted, there were "positive relationships at some points with both parents," father has failed to show there was a "significant, positive, emotional relationship." Indeed, the evidence shows the contrary. Minor was placed in her adoptive home at three years old, and father had never had custody of minor and never lived with minor except for a brief three-month period. While the adoption specialist opined there was a "strong emotional bond between" mother and minor, she made no similar pronouncement as to father and minor. By the end of the review period, minor had become "less engaged and responsive." It was unknown if the decreased engagement was due to "changes in her relationship" with father, minor's "successful acclimation" to maternal aunt's home, " 'Zoom fatigue,' " or something else. Regardless, toward the end of the reunification period, minor would begin calls by stating, " 'I don't want to talk today.' " Finally, although minor appeared to enjoy in-person visits, she did not suffer any negative reactions in transitions at the end of visits, and she had started to regress—bedwetting and soiling herself several times a day— after overnight visits commenced. (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1073–1074 [while the mother stressed evidence that in many visits the minors were happy to see her, she ignored "other evidence the juvenile court was entitled to credit . . . , including occasions on which the [minors] did not engage with her favorably, as well as evidence that her interactions with them sometimes had a negative impact on them"].)

In sum, although the Department's reports showed father's visits with minor appeared "to be mostly positive and enjoyable" for minor, the evidence

falls short of establishing the second element of the beneficial relationship exception.

As to the third element, father contends "despite the evidence of consistent visitation, along with evidence of [minor's] meaningful relationship with [f]ather, the juvenile court terminated [his] parental rights." He notes that by the time of the section 366.26 hearing, minor was five years old, "knew her father" and the "ongoing contact with [f]ather was important to her and certainly had a nurturing effect on her well-being."

Here, the record shows there simply was not a sufficiently *significant relationship*, the loss of which would outweigh the benefits of adoption, in light of minor's age, time away from parental care, and the detriment that would arise from a disruption of her current care. Indeed, the adoption specialist stated termination of parental rights would not be detrimental to minor, rather it was her "removal from the potential adoptive parents [that] would be detrimental to [her] well-being." Having considered all the evidence before it and having engaged in a careful weighing of the benefits of adoption against any detriment of termination, we conclude the juvenile court did not abuse its discretion in terminating father's parental rights.

## DISPOSITION

The juvenile court's order is affirmed.

BANKE, ACTING P. J.

WE CONCUR:

LANGHORNE WILSON, J.

SIGGINS, J.*

*In re A.G. (A169551)*

---

* Retired Presiding Justice of the Court of Appeal, First District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.